NOTICE

Decision filed 10/21/21. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2021 IL App (5th) 180365-U

NO. 5-18-0365

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 96-CF-690 |
| | ) | |
| ANDRE WHITE, | ) | Honorable |
| | ) | Stephen P. McGlynn, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justice Welch concurred in the judgment.
Justice Cates specially concurred.

**ORDER**

¶ 1    *Held*: The defendant's claim of unreasonable assistance of postconviction counsel fails where counsel filed Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) certificates, the record indicated substantial compliance with its requisites, and counsel's omission of defendant's "as-applied" constitutional challenge and supportive information from his amended postconviction petition did not prevent the trial court from considering his claim. The defendant is unable to rebut the presumption of reasonable representation and suffered no prejudice where the postconviction court was supplied with the challenge and background information for consideration. We affirm the court's judgment denying the defendant's amended postconviction petition.

¶ 2    The State charged the defendant with the first degree murder (720 ILCS 5/9-1(a)(1) (West 1994)) of Michael Hetlage. The murder was committed in St. Clair County on or about July 8, 1996. The defendant was convicted after a jury trial, and the trial court sentenced the defendant to a term of natural-life imprisonment. The defendant directly appealed his conviction

1

and sentence to this court. We affirmed. See *People v. White*, 298 Ill. App. 3d 1198 (1998) (table) (unpublished order under Supreme Court Rule 23).

¶ 3     This appeal involves the defendant's 2017 *pro se* postconviction petition challenging his sentence as unconstitutional "as-applied" to him based upon his age at the time of the crime in violation of the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). The postconviction court advanced the defendant's petition to the second stage and appointed counsel. Appointed counsel filed an amended petition. The postconviction court denied the defendant's amended postconviction petition. The defendant appeals, arguing that his appointed counsel failed to amend the petition to adequately assert the defendant's constitutional claims; failed to cite case law and/or relevant facts supporting the defendant's constitutional claims; and failed to review parts of the record. For the reasons stated in this order, we affirm the postconviction court's denial of the defendant's postconviction petition.

¶ 4                                I. BACKGROUND

¶ 5     We summarize the underlying facts involving the defendant's arrest, as well as evidence from pretrial motion hearings and his trial and sentencing, based upon the unpublished order from the defendant's direct appeal and from the briefs filed in this appeal.

¶ 6     Diane Hetlage, the victim's wife, testified that on July 8, 1996, Hetlage, an Amway distributor, left his home in St. Peters, Missouri, to meet the defendant at St. Louis Centre, a former shopping mall in downtown St. Louis, to discuss the possibility of the defendant becoming an Amway salesman. This was the second scheduled meeting about Amway employment between Hetlage and the defendant.

2

¶ 7 The next day at about 5:30 or 6 a.m., Diane, who is disabled and confined to a wheelchair, called the St. Peters, Missouri, police to report that Hetlage had not returned home after his scheduled meeting with the defendant. The St. Peters police called the defendant's grandmother's phone, as that was the telephone number the defendant provided Diane. The police left a message with the defendant's grandmother asking to have the defendant return the call. Diane testified that the defendant called her on that same date and asked her what the police wanted. Diane informed the defendant that Hetlage had not returned home from their meeting the day before. The defendant confirmed to Diane that he had met with Hetlage the day before but stated that he left Hetlage in St. Louis.

¶ 8 Officers Jeffrey Callaway and Tim Langan, both members of the St. Peters Police Department, testified that on July 10, 1996, at 8 a.m., they were assigned to investigate Hetlage's missing person report. The officers spoke with Diane, and she informed them that Hetlage had not been home or contacted her since 7:45 p.m. on July 8, 1996. Diane informed the officers that this was very unusual behavior for Hetlage as he was a responsible man and was the sole financial provider for her and their three young children. Diane told the officers that Hetlage was devoted to his children, that he dependably came home at regular times, that he rarely failed to notify someone of his whereabouts, and that he had never disappeared before then. The officers also contacted Hetlage's employer, Wilikers Restaurant and Bar, and learned that Hetlage had been employed there for 10 years and he had always reported to work, but that he was absent from work that day.

¶ 9 Next, Officers Callaway and Langan contacted the defendant's employer at the Chesterfield Mall food court. The employer informed the officers that the defendant was no longer employed there and provided them with a residential address for the defendant's mother

3

in Washington Park, Illinois. The officers then drove to the defendant's mother's house in Washington Park, arriving at approximately 1:30 p.m. Officer Callaway went to the front door, while Officer Langan watched the side and the rear of the house. Langan noticed a briefcase and two cassette tape cases lying partially behind some bushes on the side of the house. One of the cassette tape cases was open, and Langan noted that the case contained Amway motivational and sales techniques tapes. Additionally, Langan found a business card with Hetlage's name on it and a St. Peters, Missouri, video store receipt lying near the cases.

¶ 10    Two children answered the door for Officer Callaway. Callaway talked to the two children—the defendant's brother and sister—on the front porch of the Washington Park house. The children advised Callaway that the defendant was not at home but was at a friend's house. Officers Callaway and Langan then contacted the Washington Park Police Department and asked for assistance.

¶ 11    Officer Clinton McCorkle from the Washington Park Police Department testified that on July 10, 1996, at approximately 2:15 p.m., he went to the defendant's house. Upon arrival, Officers Callaway and Langan introduced themselves and told McCorkle that they were investigating a missing person report. Then, Callaway and Langan showed McCorkle the items they found on the side of the defendant's house. McCorkle testified that he looked in a vacant field adjacent to the defendant's house searching for a body, but instead he found additional documents bearing Hetlage's name, including a vehicle registration. McCorkle also spoke with a neighbor, who informed him that the defendant had been recently released from prison.

¶ 12    Then, Callaway informed McCorkle that the defendant's siblings indicated that they knew where to find the defendant. McCorkle asked the defendant's brother if he would take them to the defendant. The defendant's brother agreed. He took them to another house, where the

4

officers found the defendant. They asked the defendant to return to his house so that they could talk with him. McCorkle did not inform the defendant about the anticipated subject matter of this discussion, and the defendant then refused to speak with the officers or to return to his house with them. The defendant advised the officers that he would go nowhere with them unless he was placed under arrest. Thereafter, McCorkle placed the defendant in handcuffs and transported him back to the defendant's house. McCorkle read the defendant his *Miranda* rights. The defendant responded by informing McCorkle that he did not understand the *Miranda* rights because he was illiterate.

¶ 13 McCorkle then contacted the Illinois State Police. Illinois State Police Special Agent Clarence Banks arrived at the defendant's house and told McCorkle to transport the defendant to the police station. Upon arrival at the police station, an inventory of the defendant's personal items was conducted. Among the inventoried items was a watch, which Diane Hetlage subsequently identified at trial. She testified that the watch belonged to Hetlage and that it had been given to him by his employer on the anniversary of his 10 years of service.

¶ 14 Officers Callaway, Langan, and McCorkle testified that at the time of the defendant's arrest, they had a reasonable belief that there was probable cause to arrest the defendant, even though they were unaware of any specific crime that he may have committed because Hetlage's body and car had not been discovered. Thereafter, on July 10, 1996, between 5 and 6 p.m., Hetlage's body was discovered in an East St. Louis alley. Hetlage's body was nude except for socks. Hetlage's car was discovered the next day at approximately 8 a.m. in Washington Park.

¶ 15 The defendant's friend, Ricky Jenkins, also testified at trial. He testified that he went with the defendant to meet Hetlage on July 8, 1996, in St. Louis. When the meeting concluded, the defendant convinced Hetlage to provide the defendant and Jenkins with a ride back to Illinois.

Jenkins testified that Hetlage allowed the defendant to drive his car back to Illinois because Hetlage was unfamiliar with Illinois. When they were in East St. Louis, the defendant pulled out a gun and made Hetlage get out of the vehicle and step into an alley. He testified that the defendant ordered Hetlage to take off his clothes and lie down on the ground. Jenkins stated that the defendant shot Hetlage in the back of his head. He testified that prior to the shooting, Hetlage asked the defendant for mercy and reminded him that he had a disabled wife and three young children. When the defendant got back into Hetlage's car, the defendant had Hetlage's watch, which he put into his pocket.

¶ 16    Jenkins testified that the defendant drove Hetlage's car back to the defendant's house. Upon arrival, he directed Jenkins to remove three cases from the car and to empty the glove box. Jenkins stated that he placed the three cases along the side of the defendant's house. Jenkins assisted the defendant in removing an electric motor scooter from Hetlage's car—identified at trial as one that was used by Diane Hetlage and that was kept in Hetlage's car. The scooter was placed at the back door of the defendant's house which served as access to the basement of the house.

¶ 17    On cross-examination, Jenkins acknowledged that on this same night, his cousin, Aaron Thomas, rode over to Jenkins's mother's house in the backseat of Hetlage's car. On redirect examination, Jenkins testified that he and the defendant were also in the car.

¶ 18    Dorothy Jenkins (Jenkins's mother) and Sharon Funches, who was living at Dorothy's house in July 1996, both testified at trial about Hetlage's car. Both testified that they saw Hetlage's car at Dorothy's house in July 1996 and that the defendant was the driver of the car. They recognized the car as the same one that was later found in Washington Park on July 11, 1996, as it had Missouri disabled license plates.

¶ 19    The pathologist provided medical testimony at trial that established that Hetlage was shot six times in the back of his head. The pathologist testified that two of the wounds were "loose contact wounds," meaning that the gun was fired from less than one half of an inch from Hetlage's head, and that the other four wounds were "distant wounds," meaning that the gun was fired from a distance of at least two feet from Hetlage's head.

¶ 20    Forensic evidence submitted at trial established that the defendant's fingerprints were found both on and inside Hetlage's car and its trunk and on an envelope that contained documents belonging to Hetlage found near the defendant's house. Additionally, evidence established that Diane Hetlage's electric motor scooter was recovered from the basement of the defendant's house.

¶ 21    At trial, the defendant testified in his own defense. He stated that he met the Hetlage family when he was working at the Chesterfield Mall. Hetlage gave him his business card and then later met with the defendant about working for Amway. Hetlage provided the defendant with manuals and reading material. The defendant testified that he decided that he was not interested in working for Amway and that he talked about Amway while at Jenkins's home. Jenkins's mom, Dorothy, suggested that Jenkins needed a job and could possibly work for Amway. Thereafter, the defendant testified that he set up a second meeting with Hetlage at St. Louis Centre. He and Jenkins went to this meeting.

¶ 22    The defendant testified that St. Louis Centre was closed at the time of the meeting, so he, Jenkins, and Hetlage walked to Hetlage's car to talk. The defendant told Hetlage that he was not interested in selling Amway, but he introduced Hetlage to Jenkins. The defendant testified that Hetlage then dropped him back off at St. Louis Centre and the defendant took a bus back to Washington Park. Before he exited Hetlage's car, the defendant testified that Hetlage told him

that he and Jenkins were headed to the Casino Queen. The defendant testified that he never saw Hetlage again. He denied that he drove Hetlage across the river. He denied unloading items from Hetlage's car at his house.

¶ 23 The defendant also testified that on the date of his arrest, Jenkins's cousin, Aaron Thomas, picked him up and drove him over to Jenkins's house. Thomas gave the defendant a watch.

¶ 24 Lanaya White, the defendant's sister, briefly testified at trial. She testified that Ricky Jenkins was her boyfriend. She denied seeing Jenkins unload items from a car or seeing any items outside of the house before the police asked her about them.

¶ 25 At the conclusion of the trial, the jury found the defendant guilty of first degree murder.

¶ 26 The State sought the death penalty and argued that the defendant was eligible because he was at least 18 years of age at the time of the murder and because the murder was committed during an armed robbery. The jury concluded that the defendant was eligible for the death penalty. In the second stage of the death penalty proceedings, the defendant's trial attorney argued that the death penalty was inappropriate because of the defendant's young age of 20 and his rehabilitative potential. The defendant's attorney did not introduce any mitigating evidence regarding the defendant's upbringing, background, or education. At the conclusion of the next stage of proceedings, the jury determined that the trial court should not sentence the defendant to death.

¶ 27 At sentencing, the State asked the trial court to impose a discretionary natural-life sentence, arguing that the crime was senseless; that the defendant was dangerous; that he would likely commit murder again considering his criminal record and the evidence in this case; and that the defendant lacked remorse. In response, the defendant's attorney asked the trial court to

exercise its discretion to sentence the defendant to a term of years, arguing that although the defendant was incarcerated for armed robbery when he just 17 years of age, he had learned from his prison experience; that this offense occurred when the defendant was just 20 years of age; and that the defendant was not lacking in remorse, but was proclaiming his innocence. The defendant claimed in allocution that he was not violent, that he was not involved in the armed robberies committed in 1993, and that he did not commit the murder for which he was convicted. He also stated that he took advantage of available educational opportunities while he was incarcerated and since he had been released on parole.

¶ 28　The presentence investigation (PSI) report showed that the defendant had been adjudicated delinquent for several juvenile offenses. The defendant reported that he had received his GED and completed seven hours of college classes while imprisoned, that he had been involved in a group therapy intervention while incarcerated, and that his only employment history was his job at Chesterfield Mall. The officer who prepared the PSI report had requested records from the correctional institutions where the defendant had been incarcerated but had not received any records by the date of the report. Consequently, the sentencing court was unable to confirm the defendant's educational efforts or determine the nature and extent of the group therapy he received while incarcerated.

¶ 29　The trial court sentenced the defendant to natural life in prison. The trial court noted that the defendant had been released on parole only 49 days before this murder was committed. The trial court stated:

> "I believe in all my heart that [the defendant] is a—is a threat to anybody he encounters, *** the type of defendant who has the potential to kill anybody for any reason and in fact society has a right to be protected from [the defendant] and people like [the defendant]. *** I want to make it clear that I think [the defendant] is a threat to each and every one of us, that he is the type of individual *** he doesn't learn at all and in fact we must be protected from [the defendant]."

9

The trial court considered that the defendant's age at sentencing was "only 21" but concluded that the nature of the crime warranted the natural-life sentence.

¶ 30    A new attorney representing the defendant filed a motion to reconsider the sentence on his behalf. The attorney asked the court to resentence the defendant to an imprisonment term of around 40 years, citing the defendant's youth. The new attorney noted that the defendant's trial counsel had not presented mitigating evidence during the death penalty phase or at sentencing. Although the new attorney intimated that trial counsel should have presented mitigating evidence at earlier stages of the proceedings, he did not specify what evidence could have been presented. Defense counsel argued that a 40-year sentence would still allow the defendant the opportunity to learn from his mistakes and to be released in his 60s, while spending the prime years of his life in prison. The trial court denied this motion, stating the murder was brutal and heinous. The trial court called the defendant "a cold-blooded killer" and stated that he would probably still commit murder even at the age of 60.

¶ 31    The defendant appealed his conviction and sentence. In 1998, this court affirmed. *People v. White*, 298 Ill. App. 3d 1198 (1998) (table) (unpublished order under Supreme Court Rule 23). In that appeal, this court evaluated the defendant's sentence and held that the natural-life sentence was not excessive. *White*, slip order at 13-14. We noted that the trial court considered the fact that the defendant was 21 years of age at sentencing, that Hetlage was shot "in cold blood" six times in the back of the head, and that the murder was committed during an armed robbery. Additionally, we stated that the trial court found that Hetlage was unarmed, posed no threat to the defendant, and begged the defendant for mercy by reminding the defendant of his disabled wife and three young children. This court noted that the trial court had also indicated that the defendant made Hetlage remove his clothing to further humiliate him before killing him.

10

We found that the trial court had reviewed the defendant's PSI report and was aware that the defendant committed this murder while on parole for four armed robberies committed in 1993. We indicated that the trial court also concluded that the seriousness of the crime outweighed any rehabilitation potential the defendant possessed, and that the natural-life sentence was necessary to protect society from the defendant. We concluded that based on these factors, as well as the trial court's statement that it had considered all the statutory factors, the natural-life sentence did not constitute an abuse of discretion.

¶ 32     The defendant filed his *pro se* postconviction petition on June 15, 2017. The defendant alleged that his sentence violated the eighth amendment prohibition on cruel and unusual punishment. U.S. Const., amend. VIII. He also argued that his sentence would have been unconstitutional for a juvenile, and that because of his young adult age and lack of mental maturity when the crime was committed, he should have been treated as a juvenile. The defendant also argued that his sentence violated the Illinois Constitution's proportionate penalties and rehabilitations clauses "as applied" to him because he was only 20 years old when he committed the crime. Ill. Const. 1970, art. I, § 11. In support of his petition, the defendant attached six articles discussing the brain development of young adults. He stated that the articles supported his argument that the brain of an 18- to 24-year-old individual lacks the maturity of an adult, and that the young adult brain is no more developed than a juvenile brain. The defendant also provided background information about his childhood and upbringing that included an absentee father, an alcoholic and drug-addicted mother, a house with no utilities or running water that was infested with roaches and rats, a history of psychiatric treatment since he was 6 years of age, and an introduction to the Disciples street gang when he was 10 years of age via his mother's boyfriend. He indicated that most of his life had been spent in juvenile detention and

11

adult prison. He stated that he had a job at the time of the crime and had hopes of obtaining a job in an area steel mill where his uncle was employed. After reviewing the defendant's *pro se* petition, the postconviction court concluded that the petition stated the gist of a constitutional claim and advanced the petition to the second stage.

¶ 33 On September 13, 2017, the postconviction court appointed counsel to represent the defendant. Appointed counsel asked the clerk of the court to provide him with pleadings and transcripts from the underlying criminal case as well as a copy of the *pro se* petition. He did not ask the clerk of the court to provide him with copies of the trial exhibits.

¶ 34 Thereafter, on February 22, 2018, appointed counsel filed an amended petition which included the defendant's affidavit that addressed the timeliness of the petition. He requested that the defendant be resentenced because his designation as an adult was arbitrary. He attached the same articles that were attached to the defendant's *pro se* petition. Appointed counsel alleged that the defendant "was denied protection from cruel and unusual punishment as provided by the United States Constitution and Illinois Constitution, was denied the protection of the proportionate penalties clause of the Illinois Constitution, and was denied the protection of the Rehabilitation Clause of the Illinois Constitution." He did not specifically assert that the sentence was unconstitutional "as applied" to the defendant. He also did not include the potentially mitigating background facts that had been included in the defendant's *pro se* postconviction petition.

¶ 35 In response, the State filed its motion to dismiss the defendant's amended postconviction petition. The State argued that the petition was not timely due to the defendant's culpable negligence. Alternatively, the State contended that the defendant's claim was barred by *res judicata* because this court affirmed the trial court's discretionary life sentence after finding

12

that the trial court considered the defendant's youth and rehabilitative potential. In substantive response to the defendant's arguments, the State argued that his sentence was not unconstitutional because he was an adult when he committed the murder, and he received a discretionary natural-life sentence. Further, the State contended that no court has accepted the research included in the articles the defendant attached to the petition. Finally, the State contended that even if the research was accepted, the defendant failed to meet his burden of proof that his cognitive function and intellectual development were impacted as discussed in the research articles.

¶ 36    The postconviction court held its hearing on the defendant's amended petition. The court indicated that it had reviewed the pleadings and the posttrial motion and sentencing hearing transcript. The court concluded that the defendant was not culpably negligent for filing his petition late. The State argued that, during the sentencing hearing, trial counsel argued that the defendant's youth was a mitigating factor, and the sentencing court considered this factor and thereby considered his young adult status. Therefore, the State argued, the defendant was not unfairly sentenced. The State also argued that when the sentencing hearing took place, the law only applied to a defendant who was under the age of 18 when the crime was committed, because there was no case law supporting the applicability of *Miller* to a young adult 18 years of age or older such as the defendant. Finally, the State argued that the defendant's petition should be dismissed because he had not "provided any specific nexus between his own cognitive state and the research that he presented, making the research essentially speculative and conclusory."

¶ 37    In response, appointed counsel argued that the articles attached to the amended postconviction petition were all dated long after the defendant's sentencing and thus were not considered by the sentencing judge. He argued that articles constituted "new evidence" and that

13

the defendant was therefore entitled to a third-stage evidentiary hearing. The postconviction court asked appointed counsel to comment on the fact that while the defendant was a young adult when he committed the crime, he was certainly not a juvenile. Appointed counsel responded that while the defendant was not a juvenile offender, the articles supported the claim that his mental state was that of a juvenile.

¶ 38    The postconviction court noted that current science finds that a young adult's brain does not fully mature until the age of 25—that young adult decision-making was more impulsive. The court referenced the *Miller v. Alabama*, 567 U.S. 460 (2012), and *People v. Holman*, 2017 IL 120655, decisions and stated that those cases required sentencing courts to consider the *Miller* factors—life and upbringing, peer pressure, and possibilities of rehabilitation—if the offender was a juvenile. The court inquired about the existence of the defendant's PSI, noting that information concerning the *Miller* factors is often included in PSI reports. The postconviction court then discussed aspects of the sentencing hearing, noting that the defendant maintained his innocence and that the sentencing court considered the short period of time between the defendant's release from prison on parole and the murder of Hetlage. The court also mentioned the direct appeal and this court's conclusion that the defendant's natural-life sentence was not excessive because of the facts of the crime and the sentencing court's consideration of his young age and rehabilitative potential.

¶ 39    The postconviction court then took the matter under advisement and stated:

> "I do think twenty is a young age, and—but I think the state of the law is probably that once you get beyond juvenile status, the concerns reflected in the *** U.S. Supreme Court case of *Miller* and as just reiterated by our own Supreme Court in *Holman* are probably mitigated—certainly mitigated, perhaps abated, meaning no longer the concern.
>
> Because your sentence was evaluated by the Illinois Appellate Court on grounds of whether it was excessive given your age of twenty-one, I don't get to—I don't get to reverse the Appellate Court. *** But I think going through it, the question is were you

14

entitled to a meaningful consideration of those factors that impact a juvenile that we don't consider as impacting an adult."

¶ 40 During the hearing, the postconviction court asked appointed counsel if he had any case law supporting the argument that a defendant 18 years of age or older could be treated like a juvenile. Counsel indicated that he was not then aware of any cases, but that he would conduct a search. Later the postconviction court entered an order indicating its receipt of cases in support of the defendant's postconviction arguments. The State sent a letter to the postconviction court to distinguish the two cases provided by appointed counsel: *People v. Harris*, 2016 IL App (1st) 141744, ¶¶ 56, 68, *rev'd in part*, 2018 IL 121932, and *People v. House*, 2015 IL App (1st) 110580, *vacated and remanded*, No. 122134 (Ill. Nov. 28, 2018) (supervisory order).

¶ 41 On June 28, 2018, the postconviction court entered its written order dismissing the defendant's amended postconviction petition, noting that it had reviewed the sentencing hearing transcript and believed that the defendant's youth and rehabilitative potential were adequately considered as required by *Miller* and *Holman*.

¶ 42 Appointed counsel filed three separate certificates pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) on April 16, 2018, July 3, 2018, and October 29, 2018. Further information regarding these certificates will be included in the analysis section of this order.

¶ 43 The defendant timely filed his notice of appeal of the postconviction court's June 28, 2018, order denying his amended postconviction petition.

¶ 44                                    II. ANALYSIS

¶ 45 On appeal, the defendant claims that appointed counsel provided unreasonable assistance in amending his petition because he did not adequately frame the defendant's constitutional arguments as "as-applied" challenges, he did not cite supporting case law and background facts, and he did not review the PSI.

15

¶ 46    An individual who has been convicted and is serving an Illinois criminal sentence can file a petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2016)) to allege that their Illinois and federal constitutional rights were denied. *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). A proceeding under the Act has three stages. *People v. Gaultney*, 174 Ill. 2d 410, 418-19 (1996). Here, the postconviction court dismissed this case at the second stage. At the second stage, the postconviction court appoints an attorney to represent the defendant. 725 ILCS 5/122-4 (West 2016). The State must file an answer or file a motion to dismiss. *Id.* § 122-5. Then, the postconviction court must determine if the defendant has made a substantial showing of a constitutional violation. *People v. Edwards*, 197 Ill. 2d 239, 246 (2001). The postconviction court must accept all well-pleaded factual allegations as true, and the court must not engage in any fact-finding or credibility determinations. *Coleman*, 183 Ill. 2d at 385. The trial court must dismiss the petition if the defendant has not made the required substantial showing. *People v. Ward*, 187 Ill. 2d 249, 255 (1999). The postconviction court will hold an evidentiary hearing if the defendant gets past this second stage to the third stage. 725 ILCS 5/122-6 (West 2016).

¶ 47    We next turn to the level of legal assistance required in a postconviction process. Initially, we note that the right to counsel in postconviction proceedings is based in statute—not the federal and state constitutions. See *id.* § 122-4. Therefore, postconviction petitioners are only guaranteed the level of legal assistance required by the Act. *People v. Owens*, 139 Ill. 2d 351, 364 (1990). While a reasonable level of assistance is required by section 122-4 of the Act (725 ILCS 5/122-4 (West 2016)) and Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), defendants are not guaranteed the same level of legal assistance constitutionally guaranteed to

16

defendants at trial. *People v. Pendleton*, 223 Ill. 2d 458, 472 (2006); *People v. Greer*, 212 Ill. 2d 192, 204 (2004); *Owens*, 139 Ill. 2d at 364.

¶ 48 The Act does not require that appointed counsel provide more than "reasonable assistance," and thus, any constitutional claim of ineffective assistance of appointed counsel is outside of the scope of the Act and is not allowed. *People v. Pinkonsly*, 207 Ill. 2d 555, 567 (2003) (citing *People v. Wright*, 149 Ill. 2d 36, 64 (1992)); Ill. S. Ct. R. 651(c). "A defendant may not properly assert a constitutional claim of ineffective assistance of postconviction counsel [citation] because a postconviction petitioner is guaranteed only the level of assistance provided by the *** Act." *Pinkonsly*, 207 Ill. 2d at 567; *People v. Davis*, 156 Ill. 2d 149, 158-59 (1993) (citing *People v. Flores*, 153 Ill. 2d 264, 276 (1992)).

¶ 49 Supreme Court Rule 651(c) provides the foundation for our appellate review. To ensure reasonable assistance, Rule 651(c) requires that the record in postconviction proceedings demonstrate that postconviction counsel meet three specific obligations. *People v. Lander*, 215 Ill. 2d 577, 584 (2005). Counsel must (1) consult with the defendant to ascertain his claims of error, (2) examine the trial court record, and (3) make any amendments to the petition that are necessary to adequately present the defendant's claims to the postconviction court. Ill. S. Ct. R. 651(c). The duty to amend the petition requires postconviction counsel to "shape[ ] the petitioner's claims into proper legal form." *People v. Perkins*, 229 Ill. 2d 34, 43-44 (2007). Appointed counsel must make amendments deemed necessary to "adequately" present the claims the defendant raised in the *pro se* petition. *People v. Wallace*, 2018 IL App (5th) 140385, ¶ 30 (citing *People v. Turner*, 187 Ill. 2d 406, 412 (1999)). However, appointed counsel is not required to file an amended petition if the claims raised by the defendant lack merit. *Id.*; *Davis*, 156 Ill. 2d at 164. Similarly, the Rule 651(c) requirement that appointed counsel must examine

17

the record only requires that counsel "examine as much of the [record] as is necessary to adequately present and support those constitutional claims raised by the petitioner." *Davis*, 156 Ill. 2d at 164.

¶ 50　One aspect of "reasonable assistance" is compliance with Supreme Court Rule 651(c). Ill. S. Ct. R. 651(c); *People v. Daniels*, 388 Ill. App. 3d 952, 960 (2009) (citing *People v. Bashaw*, 361 Ill. App. 3d 963, 967 (2005)). A Rule 651(c) certificate filed by appointed counsel presents a rebuttable presumption that counsel provided reasonable assistance. *People v. Profit*, 2012 IL App (1st) 101307, ¶ 19. The defendant has the burden to overcome this presumption by establishing that his or her appointed counsel did not comply with the mandatory Rule 651(c) duties. *Id.* The question of whether the defendant was provided with a reasonable level of assistance is reviewed *de novo. Wallace*, 2018 IL App (5th) 140385, ¶ 31. When a defendant claims that appointed counsel deficiently performed his or her duties or in some other way failed to provide reasonable assistance, "the defendant must show not only how the attorney's performance was deficient or unreasonable but also what prejudice resulted from that deficiency." *People v. Landa*, 2020 IL App (1st) 170851, ¶ 58.

¶ 51　Before we review the specific claims raised by the defendant on appeal, we will review the three obligations imposed upon appointed counsel by Supreme Court Rule 651(c) to determine in a general sense whether appointed counsel's actions and filings complied with the Rule 651(c) obligations. We start with the three Rule 651(c) certificates filed with the court.

¶ 52　In the first certificate of compliance filed on April 16, 2018, appointed counsel stated that he consulted with the defendant to ascertain his contentions of deprivation of constitutional rights on five occasions: December 4, 2017 (in person), October 17, 2017 (correspondence), December 6, 2017 (correspondence), December 21, 2017 (correspondence), and January 29,

2017.[1] In addition, appointed counsel stated that he reviewed correspondence he received from the defendant dated December 18, 2017, and February 12, 2018. Appointed counsel stated that he "examined the entire record of the proceedings of trial." Finally, counsel stated that he made amendments to the defendant's *pro se* petition necessary for an adequate presentation of the defendant's claims.

¶ 53    In the July 3, 2018, certificate of compliance, appointed counsel stated that he consulted with the defendant to ascertain his contentions of deprivation of constitutional rights. In addition to dates listed in the April 16, 2018, certificate, he listed additional correspondence he sent to the defendant on April 19, 2018, and May 18, 2018. Counsel also stated that he reviewed additional correspondence he received from the defendant on March 13, 2018, and April 25, 2018. Finally, he met with the defendant a second time on April 16, 2018. Appointed counsel stated that he reviewed the entire record of the proceedings at trial and that he amended the *pro se* petition as necessary to adequately present the defendant's claims.

¶ 54    Finally, in the October 29, 2018, certificate of compliance, appointed counsel indicated that he consulted with the defendant, that he examined the entire trial record, and that he made any amendments necessary for adequate presentation of the defendant's claims.

¶ 55    Before considering whether counsel met these obligations, it would be helpful to review the relevant case law that provides the foundation for the defendant's argument on appeal. In 2012, the United States Supreme Court handed down its opinion in *Miller v. Alabama*. There, two 14-year-old offenders were convicted of murder and sentenced to life without the possibility of parole. *Miller*, 567 U.S. 460. In both cases, the sentencing courts had no discretion to impose a lesser punishment. *Id.* The Court explained that:

---

[1]Given the sequence of the dates in this certificate, we believe that this was a typographical error and that appointed counsel intended the date to be January 29, 2018—not January 29, 2017.

"Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." *Id.* at 477-78.

Ultimately, the United States Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Id.* at 479. In 2016, the United States Supreme Court stated in *Montgomery v. Louisiana*, 577 U.S. 190, 212 (2016), that *Miller* stated a substantive rule of constitutional law, and its "conclusion that the sentence of life without parole is disproportionate for the vast majority of juvenile offenders raises a grave risk that many are being held in violation of the Constitution." *Montgomery* established that *Miller* was to be construed retroactively. *Id.*

¶ 56    After the *Miller* and *Montgomery* decisions, the Illinois legislature enacted section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2016)), which mandated that sentencing courts consider the following mitigating factors for offenders who were under the age of 18 when they committed an offense:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

20

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." *Id.*

This statute took effect on January 1, 2017.

¶ 57 Thereafter, the Illinois Supreme Court delivered its opinion in *People v. Holman*, 2017 IL 120655. In that case, the defendant was 17 years old when he committed murder. *Id.* ¶ 1. The court discretionarily sentenced him to life without parole for this 1979 murder. *Id.* ¶¶ 1, 2. At issue was whether his original sentencing hearing complied with *Miller v. Alabama*. *Id.* ¶ 1. In *Holman*, the supreme court adopted *Miller* factors in cases where a court has the discretion to sentence a juvenile defendant to life imprisonment without parole, stating that this sentence could only be imposed "if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Id.* ¶ 46. The supreme court provided directions to courts facing this situation as follows:

"The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense, and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or

21

prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation. *Id.* (citing *Miller*, 567 U.S. at 477-78).

¶ 58    The *Holman* court noted the difficulty facing courts in situations where the juvenile defendant was sentenced before our legislature enacted section 5-4.5-105 of the Unified Code of Corrections, stating that "any inquiry into the *Miller* factors is backwards-looking." *Id.* ¶ 47. The court confirmed that when revisiting a juvenile's life-without-parole sentence, the only evidence that matters is the evidence of the defendant's youth and the associated characteristics that existed at sentencing. *Id.* "Whether such evidence exists depends upon the state of the record in each case. A court revisiting a discretionary sentence of life without parole must look at the cold record to determine if the trial court considered such evidence at the defendant's original sentencing hearing." *Id.* The court reviewed the record in *Holman* and concluded that while the sentencing court had no evidence regarding any of the statutory factors in mitigation, and only some evidence related to the *Miller* factors, there was ample evidence in aggravation. *Id.* ¶ 50. The mitigating evidence that was considered by the *Holman* sentencing court included information about the death of the defendant's father and stepfather while he was a juvenile, his limited education, and his neurological and intellectual impairment. *Id.* ¶¶ 8, 11-12. Considering all evidence in mitigation and aggravation, the supreme court concluded that the sentencing court's conclusion that the defendant was beyond rehabilitation passed constitutional muster under *Miller*. *Id.*

¶ 59    We note that in this case the defendant was sentenced on December 19, 1996, long before these cases were decided. Our review in this case is similar to the review described in *People v. Holman.* We must look at the cold record to determine if the defendant, who received a natural-life sentence for a murder committed when he was 20 years old, is entitled to a new sentencing hearing and reversal of the trial court's order denying his request.

22

¶ 60     In this appeal, the defendant first argues that appointed counsel did not adequately frame his constitutional challenge as an "as-applied" challenge. The defendant also alleges that appointed counsel did not provide support for his "as-applied" constitutional challenge with case law or with the inclusion of supportive information about the defendant's upbringing and background. Finally, the defendant argues that appointed counsel failed to review his PSI report as part of his review of the record. He asks this court to remand his case for further second-stage proceedings and to direct the postconviction court to appoint new counsel.

¶ 61                              A. "As-Applied" Challenge

¶ 62     The defendant first argues that his appointed counsel did not adequately present his claim that the life sentence was unconstitutional "as applied" to him. He presented an unconstitutional "as-applied" claim in his *pro se* postconviction petition and cited the eighth amendment of the United States Constitution (U.S. Const., amend. VIII), which prohibits "cruel and unusual punishments," and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11), which mandates that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." "A statute may be deemed unconstitutionally disproportionate if (1) the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community; (2) similar offenses are compared and the conduct that creates a less serious threat to the public health and safety is punished more harshly; or (3) identical offenses are given different sentences." *People v. Miller*, 202 Ill. 2d 328, 338 (2002). In *People v. Miller*, the Illinois Supreme Court opted not to define what type of punishment would be deemed cruel, degrading, or shockingly disproportionate, stating that "as our society evolves, so too do our

23

concepts of elemental decency and fairness which shape the 'moral sense' of the community." *Id.* at 339.

¶ 63    The Illinois Supreme Court has held that sentencing requirements established by the United States Supreme Court in *Miller v. Alabama* do not apply to persons 18 years of age or older in a facial constitutional challenge. *People v. Harris*, 2018 IL 121932, ¶ 61. We note that although the eighth amendment challenge in *People v. Harris* was a facial challenge and limited to those defendants under the age of 18, the Illinois Supreme Court did not expressly state that an "as-applied" challenge was unavailable to those defendants 18 years of age or older.

¶ 64    The defendant cites to *People v. Thompson*, 2015 IL 118151, ¶¶ 36-38, 44, an Illinois Supreme Court opinion, for the proposition that a challenge to a life sentence for a young adult must be framed as an "as-applied" constitutional challenge. The defendant in *Thompson* raised both a facial constitutional challenge and an as-applied constitutional challenge to the sentencing statute. *Id.* ¶ 17. He argued that the sentencing statute was unconstitutional as applied to him because he was 19 years old on the date of the crime, he had no criminal history, and he committed the offense after years of parental abuse. *Id.* The *Thompson* court distinguished an "as-applied" challenge from a facial challenge. The supreme court noted that with a facial challenge, the argument presented is that a statute is unconstitutional under "any set of facts, *i.e.*, the specific facts related to the challenging party are irrelevant." *Id.* ¶¶ 36-37 (citing *People v. Garvin*, 219 Ill. 2d 104, 117 (2006)). Conversely, the supreme court noted that an "as-applied" challenge claims that a statute is unconstitutional "as it applies to the facts and circumstances of the challenging party." *Id.* "By definition, an as-applied constitutional challenge is dependent on the particular circumstances and facts of the individual defendant or petitioner." *Id.* Although the supreme court distinguished the two constitutional challenges, the holding in *Thompson* was

simply that a defendant cannot raise an "as-applied" constitutional challenge for the first time on appeal, and not that constitutional arguments against excessive sentencing for a young adult must be presented as "as-applied" challenges. *Id.* ¶ 44.

¶ 65    Similarly, the defendant cites to *Harris*, 2016 IL App (1st) 141744, ¶¶ 56, 68, and *House*, 2015 IL App (1st) 110580, ¶¶ 101-02, to further support his claim "that a young adult's challenge to a life sentence under the proportionate penalties clause of the Illinois Constitution should be framed as an 'as-applied' challenge." Both cases involved an "as-applied" constitutional challenge. See *Harris*, 2016 IL App (1st) 141744, ¶¶ 57-69 (on direct appeal from his first degree murder conviction (crime committed at 18 years of age) and 76-year aggregate term of imprisonment, the appellate court found that the defendant's "as-applied" challenge to the proportionate penalties clause of the Illinois Constitution had merit due to his youth and his rehabilitative potential); *House*, 2015 IL App (1st) 110580, ¶¶ 83-102 (on appeal from dismissal of the defendant's second stage postconviction petition, the appellate court affirmed the dismissal but vacated the natural-life sentence for two counts of first degree murder on a theory of accountability (crimes committed at 19 years of age) and remanded for a new sentencing hearing concluding that his sentence violated the proportionate penalties clause of the Illinois Constitution based on the defendant's youth, that he was only a lookout during the commission or the crime, that the shooter received the identical sentence, and that he had no history of prior violent crimes).

¶ 66    There is no question that there is a distinction between a facial and an "as-applied" constitutional challenge. Similarly, there is no question that appointed counsel in this case did not label the defendant's constitutional challenges in the amended petition as "as-applied" challenges. The 651(c) certificates filed by appointed counsel provide no insight into his decision

to remove the "as-applied" challenges. Appointed counsel may have believed, after review of the case and the *pro se* petition, that the "as-applied" claims were frivolous, spurious, or nonmeritorious. See *Greer*, 212 Ill. 2d at 205 (stating that postconviction counsel is not required "to advance frivolous or spurious claims," and that doing so would violate counsel's obligations under Illinois Supreme Court Rule 137 (eff. Feb. 1, 1994)). It is worth noting that this court has been reluctant to extend *House* and find the protections of *Miller* applicable in cases involving defendants who, like the defendant in this case, were active participants in the offenses and who were no longer "on the cusp between a juvenile and adult" (*People v. White*, 2020 IL App (5th) 170345, ¶ 28).

¶ 67    It is worth noting that, while appointed counsel did not explicitly frame the constitutional claims as "as-applied" challenges, he also did not explicitly frame them from a facial perspective—that is, he did not assert that the two provisions were unconstitutional under "any set of facts" (*Thompson*, 2015 IL 118151, ¶¶ 36-37 (citing *Garvin*, 219 Ill. 2d at 117)). Although *Thompson*, *House*, and *Harris* did not expressly mandate an "as-applied" presentation of constitutional challenges, for a claim such as the defendant's youth-based sentencing challenge to be viable under the current state of the law, the claim must be framed as an "as-applied" challenge and supported by factual allegations showing that the *Miller* factors should be applied to the particular young adult defendant. See, *e.g.*, *People v. Ross*, 2020 IL App (1st) 171202, ¶ 26; *People v. Bland*, 2020 IL App (3d) 170705, ¶ 14; *People v. Daniels*, 2020 IL App (1st) 171738, ¶ 34.

¶ 68    In this case, as just discussed, the defendant's claim was not clearly labeled as either an "as-applied" challenge or a facial challenge, although, as we will discuss in more detail later, the postconviction court appears to have treated it as an "as-applied" challenge. In addition, the facts

26

supporting the defendant's constitutional claims—the facts and legal arguments found by the postconviction court to state the gist of a constitutional claim—were not included in the amended petition filed by appointed counsel. The only time that these mitigating facts were presented to a court of law was in the defendant's *pro se* postconviction petition. The defendant's PSI contained no reference to his upbringing other than his juvenile and adult criminal charges. The defendant's trial attorney did not present these facts to the court at his sentencing hearing. Posttrial counsel referenced unspecified mitigating facts in noting that the defendant's trial attorney should have presented the mitigating facts to the court at sentencing. However, posttrial counsel did not provide the court with any details. The defendant included these "as-applied" background facts in his *pro se* petition. Then, postconviction counsel omitted the mitigating facts in amending the petition.

¶ 69    The omitted "as-applied" details about the defendant's childhood and young adulthood are as follows: the defendant began psychiatric care at the age of six; the defendant was in and out of juvenile detention and the Illinois Department of Corrections; the defendant did what he had to do in order to ensure that his two siblings had food to eat; the house where the defendant and his siblings lived did not have electricity, gas, or water and was infested with roaches and rats; and the defendant's father was absent. The defendant's mother began dating an ex-convict who was a member of the Gangster Disciples and she encouraged the 10-year-old defendant to interact with him; at that same age, the defendant's mother was addicted to alcohol and crack cocaine; each time the defendant was released from detention or prison, his mother had him "go out and do things to provide her with drug money"; and after the defendant was released from prison, he attempted to break away from his mother, who was still addicted to drugs, but she advised him "to let go of the idea of working for a living."

27

¶ 70     We note that appointed postconviction counsel filed the defendant's amended petition in this case in February of 2018, prior to the issuance of most of the decisions we relied upon in concluding that a young adult's youth-based sentencing challenge is not viable unless framed as an "as-applied" challenge and supported by pertinent factual allegations. We also note that counsel's Rule 651(c) certificates establish that he otherwise complied with the rule. Even if we were to find—and we do not—that appointed counsel's representation was deficient in this case, that finding would not end our inquiry. The defendant would also need to demonstrate that appointed counsel's failure to properly present his constitutional challenges prejudiced him. See *Landa*, 2020 IL App (1st) 170851, ¶ 58. As we will explain in more detail, counsel's framing of the issue did not prevent the postconviction court's consideration of his "as-applied" claims.

¶ 71     The defendant's *pro se* petition was in the common law record. Attached to the defendant's petition was his affidavit sworn under oath and signed in the presence of a notary public. The postconviction court reviewed and considered the defendant's *pro se* petition in determining that the defendant stated a gist of a constitutional claim warranting the petition's progression to the second stage. The postconviction court's focused consideration of the issues at the hearing on the defendant's amended postconviction petition displayed the court's intent to provide the defendant with a hearing based on the merits of his claims. In the court's order denying the defendant's request for a new sentencing hearing, the judge indicated that he had "reviewed the file, pleadings of the parties, the transcript of the sentencing hearing, [and] the 5th Dist[rict] Appellate Court's Rule 23 decision." Although the amended postconviction petition contained none of the mitigating background details about the defendant's family life, education, job, and criminal histories, the *pro se* petition did contain that information. The *pro se* petition was part of the court file reviewed by the postconviction court. Where an original pleading is

28

verified, the original pleading remains part of the record even when an amended pleading is filed. *Konstant Products, Inc. v. Liberty Mutual Fire Insurance Co.*, 401 Ill. App. 3d 83, 86 (2010) (citing *Robins v. Lasky*, 123 Ill. App. 3d 194, 198 (1984)).

¶ 72    From the transcript of the hearing on the defendant's amended postconviction petition, the postconviction court carefully approached the process as indicated in more detail in paragraphs 37 to 39 of this order. The court noted the current science regarding a young adult's brain, cited to the specific standards outlined in *Miller v. Alabama* and *People v. Holman*, and asked about the PSI report, where there could be additional mitigating background information. The postconviction court discussed the sentencing court's analysis and consideration of factors in mitigation and aggravation and this court's determination that the sentence was not excessive despite the defendant's young adult status. The court noted that the defendant was only 20 years old when the crime was committed.

¶ 73    The postconviction court also carefully reviewed the sentencing hearing transcript to determine if the "cold record" contained sufficient detail to ensure that the sentencing court adequately considered the *Miller* factors. *Holman*, 2017 IL 120655, ¶¶ 47, 50. The postconviction court concluded that the sentencing court had considered some of the *Miller* factors—the defendant's young adult status and rehabilitative potential—before sentencing the defendant to a natural-life sentence. We note that the postconviction court was aware of the sentencing judge's statements expressly finding that the defendant was likely to remain a danger to the public for the remainder of his life.[2] Therefore, implicit in the postconviction court's

---

[2]In *Jones v. Mississippi*, the United States Supreme Court stated that *Miller* does not require a sentencing court to make an explicit factual finding of permanent incorrigibility before sentencing a juvenile murderer under the age of 18 to a life without an opportunity for parole. *Jones v. Mississippi*, 593 U.S. __, __, 141 S. Ct. 1307, 1318-19 (2021). The eighth amendment allows a juvenile offender to be sentenced to life without parole if the sentence is not mandatory and the sentencing court has the discretion to " 'consider the mitigating qualities of youth' " and to impose a lesser punishment without a

29

conclusion was a finding that even if the sentencing judge had been presented with additional mitigating facts, the totality of mitigating factors would not have outweighed the aggravating factors present in this case.

¶ 74    Despite the presentation of the defendant's issues in the postconviction petition that did not include the "as-applied" language and mitigating background facts to the constitutional challenges, we find that the postconviction court provided the defendant with the review he sought in his *pro se* petition. As the defendant received an "as-applied" consideration in postconviction court, and because the sentencing court considered some of the *Miller* factors before sentencing the defendant to natural life, postconviction counsel's framing of the issues did not affect the outcome of the case. Therefore, we find that the defendant was not prejudiced by counsel's omissions. *Landa*, 2020 IL App (1st) 170851, ¶ 58.

¶ 75                    B. Lack of Citation to Case Law in Amended Petition

¶ 76    The defendant next contends that appointed counsel provided inadequate representation because no cases were cited in the amended petition. We disagree. Although case law is a standard basis of support of legal arguments, there is no mandate that appointed counsel cite and argue case law. Moreover, while appointed counsel did not cite case law in his amended petition and informed the trial judge that he was unaware of case law, the record establishes that he subsequently provided cases to the judge—*People v. House* and *People v. Harris*, the very cases

---

requirement that the court engage in a formal fact finding. *Id.* at ___, 141 S. Ct. at 1314-15 (quoting *Miller*, 567 U.S. at 476). As stated by the Illinois Supreme Court in *People v. Holman*: "Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46. Since the United States Supreme Court issued its opinion in *Jones v. Mississippi*, the Illinois Supreme Court has not held that sentencing courts no longer need to make a determination of permanent incorrigibility before sentencing a juvenile offender to a life sentence.

30

cited by the defendant on appeal. Thus, the trial court was presented with case law supporting the defendant's arguments before the trial court ruled on his amended postconviction petition.

¶ 77    Furthermore, Illinois case law involving the constitutionality of young adult sentences was limited when the postconviction petition and amended postconviction petition were filed. The amended petition was filed on February 22, 2018. At that time, *People v. Thompson* had been decided, but as stated earlier in this order, *Thompson* did not stand for the proposition that constitutional sentencing arguments involving young adults must be composed as "as-applied" challenges. *Thompson* suggested that an "as-applied" challenge was possible but did not set forth the parameters of such a claim. See *Ross*, 2020 IL App (1st) 171202, ¶ 20. The First District of our Illinois Appellate Court had issued *People v. House* in 2015 and *People v. Harris* in 2016, both analyzing "as-applied" constitutional challenges. However, neither case stood for the proposition that the constitutional claims had to be framed as "as-applied" challenges.

¶ 78    Finally, the postconviction judge treated this case as if *Miller* and *Holman* were applicable, and therefore, appointed counsel's decision to include no case law in the amended postconviction petition did not prevent the defendant from presenting his claim to the court. The postconviction court reviewed the sentencing hearing and concluded that the sentencing court considered some of the *Miller* factors—defendant's young adult status and rehabilitative potential.

¶ 79            C. Lack of Facts Included in Amended Petition

¶ 80    The defendant also argues that appointed counsel's representation was inadequate because there were no facts about the defendant's life included in the amended petition to support the claim that the evolving science on juvenile maturity and brain development applied to the defendant. As stated earlier in this order, the record contains no information about

31

appointed counsel's rationale for omitting the mitigating facts when amending the petition. While the mitigating factors were critical to an "as-applied" consideration of his constitutional claims, we find that the absence of the mitigating facts did not prevent the court from considering the defendant's claim as the facts were included in his original *pro se* petition that remained in the record. The postconviction judge concluded that the sentencing judge did consider *Miller* factors in determining the defendant's sentence. Therefore, the defendant was not able to establish that appointed counsel's omissions in representation prejudiced his case. *Landa*, 2020 IL App (1st) 170851, ¶ 58.

¶ 81                                D. Failure to Review the Defendant's PSI Report

¶ 82     Finally, the defendant argues that the record suggests that appointed counsel did not examine the defendant's PSI report. He urges this court to find that appointed counsel was not in compliance with the mandate of Supreme Court Rule 651(c) that counsel "examined the record of proceedings at the trial." Ill. S. Ct. R. 651(c). The defendant correctly states that appointed counsel is obligated to examine portions of the record "necessary to adequately present and support" the defendant's claims. *Davis*, 156 Ill. 2d at 164-65. A criminal record is typically divided into three parts—the report of proceedings, the common law record, and exhibits. *People v. Blanchard*, 2015 IL App (1st) 132281, ¶¶ 18-19 (citing Ill. S. Ct. R. 324 (eff. Feb. 1, 1994)).

¶ 83     The defendant bases his argument—that appointed counsel did not review the exhibits, and thus, did not examine the defendant's PSI report—on appointed counsel's request to the clerk of the court asking for copies of the pleadings and transcripts, but not asking for copies of the exhibits. The defendant did not provide an affidavit either from appointed counsel or from the clerk of the court verifying that appointed counsel did not review the exhibits. However, we

note that a review of appointed counsel's Rule 651(c) certificates specifically indicates that he reviewed "the entire trial record."

¶ 84 Furthermore, the PSI report contained no mention of the defendant's allegedly dysfunctional and harmful home environment, nor did it reference a history of past and/or current mental health issues. The officer who prepared the defendant's PSI report asked the defendant if he or any member of his family had any mental health issues. The defendant negatively answered both questions. Thus, the defendant cannot show that the PSI report was a portion of the record "necessary to adequately present and support his claims." *Davis*, 156 Ill. 2d at 164-65.

¶ 85 Overall, we find that whether appointed counsel reviewed the defendant's PSI report has no bearing on the outcome of the defendant's amended postconviction petition. On June 28, 2018, the postconviction judge entered an order denying the defendant's postconviction request for a new sentencing hearing after reviewing and considering the pleadings of the parties, the sentencing hearing transcript, this court's order on the defendant's direct appeal, and the arguments of counsel. The postconviction judge noted that while the sentencing judge did not expressly recite and address each factor set forth in *Miller* and *Holman*, the sentencing judge had sufficiently considered the factors and considered the defendant's age and his status as a young adult, the gravity of the sentence, and the defendant's potential for rehabilitation.

¶ 86                                III. CONCLUSION

¶ 87 We find no basis to conclude that the trial court erred in denying the defendant's request for a new sentencing hearing. We find that the postconviction court analyzed the defendant's constitutional arguments following the "as-applied" framework. See *Miller*, 567 U.S. at 477-78; *Miller*, 202 Ill. 2d at 338; *Landa*, 2020 IL App (1st) 170851, ¶ 58. Further, after reviewing the

33

cold record in this case, we conclude that the sentencing court adequately considered the applicable *Miller* factors—the defendant's youth and rehabilitative potential—and thus, as the supreme court found in *Holman*, the sentencing court's determination was constitutionally appropriate given the facts of this case. We agree with the postconviction court's assessment that the defendant failed to make a substantial showing of a constitutional violation. *Edwards*, 197 Ill. 2d at 246. For the reasons stated in this order, we affirm the June 28, 2018, judgment of the St. Clair County circuit court.

¶ 88   Affirmed.

¶ 89   JUSTICE CATES, specially concurring:

¶ 90   I agree with my colleagues' determination that the defendant's amended postconviction petition was properly dismissed, but I disagree with a portion of their reasoning. I find that postconviction counsel adequately framed the defendant's "as-applied" constitutional challenges to his sentence, and that counsel's decision to exclude the "supportive information" regarding defendant's upbringing and mental health from the amended petition was appropriate where the "supportive information" was rebutted by the record. After reviewing the record, including the PSI, reports of proceedings, defendant's *pro se* postconviction petition, the amended petition, and the content of postconviction counsel's Rule 651(c) certificates, I find that postconviction counsel acted reasonably in amending the defendant's *pro se* petition and that the postconviction court understood the issues presented.

¶ 91   On June 15, 2017, the defendant filed his multi-count *pro se* postconviction petition. The defendant first alleged that he was "facially challenging the constitutionality of his sentence" as a due process violation under the under the fourteenth amendment to the United States

34

Constitution (U.S. Const., amend. XIV). In support of his facial challenge to the constitutionality of his sentence, the defendant claimed that setting the age of 18 years old as the bright line between a juvenile and an adult was arbitrary. In this section of his petition, the defendant outlined the 118-year history regarding the creation of the Juvenile Court, but claimed that he "should never have been considered a [*sic*] adult based on a [*sic*] 'arbitrary' number that the judicial system established over 118 years ago." The defendant went on to point out that several European countries treated persons between the ages of 18-25 as juveniles, not as adults.

¶ 92    The defendant next alleged that "his equal protection rights were violated under the equal protection clause of the 14th Amendment" in that he suffered "extreme prejudice" when he was sentenced to life in prison, and not given the same considerations as if he were a juvenile offender. The defendant claimed he should have been sentenced as a juvenile because scientific evidence in neuroscience proved that the brains of people ages 18-24 "are no more developed than a juvenile brain and that the distinctive attributes and characteristics that are in juveniles are also in young adults."

¶ 93    The defendant further alleged that his sentence violated the prohibition against cruel and unusual punishment under the eighth amendment (U.S. Const., amend. VIII). Again, the defendant claimed he suffered "extreme prejudice" when he was sentenced as an adult instead of as a juvenile. The defendant also claimed there was scientific evidence that he "was not a [*sic*] adult at the time [he] was charged" with the crime. The defendant relied on *Miller v. Alabama*, 567 U.S. 460 (2012), in support of his argument that the eighth amendment required "proportionality of punishment." Additionally, the defendant cited *Roper v. Simmons*, 543 U.S. 551 (2005), for the proposition that the eighth amendment prohibited the death penalty for juvenile offenders. Finally, the defendant relied on *Graham v. Florida*, 560 U.S. 48 (2010),

pointing out that juvenile offenders could not be sentenced to life without the possibility of parole. The defendant did not make a specific, "as-applied" challenge in this claim.

¶ 94 Next, the defendant alleged that his mandatory life sentence was unconstitutional "as applied to him" in that it violated the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). Here, the defendant claimed he should have received *Miller* protections, "the same type of protection, treatment and conditions that juveniles receive when they are facing a mandatory life sentence." The defendant reasoned that "newly discovered scientific evidence in neuroscience has proven that young adults age 18-24 are no more developed than a juvenile brain," and that the same evidence "has proven that the petitioner suffers from the same immaturity and characteristics traits as a juvenile." The defendant argued that his sentence should be vacated because "newly discovered scientific evidence in neuroscience proves that people ages 18-24 are not yet fully mature adults and that their brains are still developing." The defendant noted that he included "supporting evidence and research articles" supporting his argument.

¶ 95 The defendant further argued that article I, section 11 of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) included a "rehabilitation clause" which "focuses on the objective of rehabilitation." Because he was a youthful offender, the defendant urged that his rights under this clause were violated as well.

¶ 96 As noted above, the defendant attached and referenced articles from scientific and criminal justice journals that explained the developing science on the maturity (or lack thereof) in the brains of juveniles and young adolescents. Those articles discussed issues surrounding the decision to draw 18 years of age as the arbitrary line for determining whether criminal acts should be deemed juvenile offenses or adult offenses. Relying on those articles, the defendant

36

claimed that he suffered from the same immaturity noted by researchers, and that he was entitled to the *Miller* protections. Additionally, the defendant recited his personal history, stating that his mother began taking him to a psychiatrist at age six. By age 10, the defendant claimed he was introduced to a street gang, the Gangster Disciples, through his mother's ex-boyfriend. Subsequently, the defendant indicated that during his youth, he was held as a juvenile offender in a detention center, and then, as an adult, imprisoned in the Illinois Department of Corrections (IDOC). Although he had held a job when he was not incarcerated, the defendant claimed he was also told, early on, "to let go of the idea of working for a living."

¶ 97 Subsequent to the filing of his *pro se* postconviction petition, postconviction counsel was appointed to represent the defendant. On February 22, 2018, postconviction counsel filed an "Amended Petition for Post-Conviction Relief." The allegations in the amended petition mirrored the claims raised by the defendant in his *pro se* petition. Specifically, postconviction counsel alleged the following:

> "8. In his conviction and sentence, Petitioner was denied due process and equal protection as provided by the United States Constitution and Illinois Constitution, was denied protection from cruel and unusual punishment as provided by the United States Constitution and Illinois Constitution, was denied the protection of the proportionate penalties clause of the Illinois Constitution, and was denied the protection of the Rehabilitation Clause of the Illinois Constitution [as] follows:
>
> > a. Petitioner's sentence was unconstitutional. At the time of the sentencing, Petitioner was 20 years old, and was sentenced as an adult. Illinois' determination that a defendant is an 'adult' at the age of eighteen (18) is arbitrary and is not supported by science.
> >
> > b. New studies in neuroscience have determined that the brains of individuals aged 18-24 are no more developed than juvenile brains. Based on this scientific evidence, Petitioner was a juvenile at the time of his conviction and sentence, not an adult.
> >
> > c. It was a gross miscarriage of justice to sentence Petitioner as an adult and subject him to a mandatory natural life sentence when we

now have scientific evidence that proves he was not an adult at the time he was charged and convicted. This very same scientific evidence in neuroscience can and will discredit the judicial system theory that a person is a legal adult at the age of 18."

¶ 98    Postconviction counsel attached the same journal articles referenced and incorporated into the defendant's *pro se* petition as exhibits in support of the amended postconviction petition. Postconviction counsel also attached a supporting affidavit from the defendant. In that affidavit, the defendant explained that, although he was 20 years old at the time he was convicted, he did not believe he should have been treated as an adult. Additionally, the defendant  stated that he had attached scientific articles to his *pro se* petition that explained his arguments, and that these articles were not available at the time he was convicted.

¶ 99    On April 16, 2018, postconviction counsel filed his first certificate of compliance pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). In his verified certificate, postconviction counsel stated that he had "examined the entire record of the proceedings of trial," and that he had "made any amendments to the Petition for Post-Conviction Relief, filed *pro se*, that were necessary for adequate presentation of Petitioner's contentions." Postconviction counsel further stated that he met with the defendant personally on December 4, 2017, "to ascertain his contentions of deprivation of constitutional rights." Postconviction counsel also indicated that he corresponded with the defendant on October 17, 2017, December 6, 2017, December 21, 2017, and January 29, 2017,[3] all "to ascertain his contentions of deprivation of constitutional rights." Moreover, counsel stated that he reviewed correspondence from the defendant dated December 18, 2017, and February 12, 2018. Counsel concluded by stating his "certificate is in compliance with Supreme Court Rule 651(c)."

---

[3]Given the sequence of dates in this certificate, it appears that the January 29, 2017, was a typographical error, and that the correct date of that correspondence was January 29, 2018.

¶ 100   On July 3, 2018, postconviction counsel filed a second certificate of compliance in accordance with Rule 651(c). Counsel again stated that he had made any amendments necessary for the "adequate presentation of Petitioner's contentions" and had met with the defendant-petitioner a second time, on April 16, 2018, "to ascertain his contention of deprivation of constitutional rights." Counsel also stated that he had corresponded with the defendant on April 19, 2018, and May 18, 2018, in addition to the dates mentioned in his first certificate of compliance. Counsel indicated he had reviewed correspondence from the defendant dated November 2, 2017, December 18, 2017, February 12, 2018, March 13, 2018, and April 25, 2018, all "to ascertain his contentions of deprivation of constitutional rights."

¶ 101   On October 29, 2018, postconviction counsel filed a third certificate of compliance. For the third time, counsel indicated that he had examined the entire record, met with the defendant, and made the necessary amendments to the *pro se* petition. All of counsel's averments were made under oath and in compliance with Illinois Supreme Court Rule 651(c).

¶ 102   The State filed a motion to dismiss the defendant's amended postconviction petition. The State argued, in part, that the defendant offered no evidence of a nexus between his own cognitive status and the research articles he referenced in his postconviction petition, and that the trial court had taken the defendant's youth into account when sentencing the defendant.

¶ 103   On June 28, 2018, the circuit court made the following findings as to the defendant's postconviction petition:

> "This court finds that while the trial court did not expressly recite and address each of the factors set out in *Holman*, Judge Cueto sufficiently considered the necessary factors when sentencing a defendant the age of Mr. White at the relevant times and the gravity of the sentence imposed. This court finds the sentence imposed by Judge Cueto and his

consideration of Mr. White's young age and potential for rehabilitation met the standards set out in *Miller* and *Holman*."

In accordance with these findings, the circuit court denied the defendant's postconviction request for a new sentencing hearing.

¶ 104 On appeal, the defendant asserts that postconviction counsel failed to provide a reasonable level of representation as required by Illinois Supreme Court Rule 651(c) (eff. July 1, 2017), in that counsel failed to raise an "as-applied" constitutional challenge to his sentence of natural life based upon emerging science on brain development. The defendant also claims that his postconviction counsel failed to cite any case law and failed to provide the court with detail on the applicability of the evolving brain science to the defendant. Finally, the defendant claims that postconviction counsel did not read the presentence investigation report. The defendant asks this court to vacate the order dismissing his petition and to remand the cause for further second-stage proceedings with new counsel.

¶ 105 The Post-Conviction Hearing Act (Act) provides a means by which a person convicted of a criminal offense may assert that his conviction was a result of a substantial denial of a federal or state constitutional right. 725 ILCS 5/122-1(a)(1) (West 2018); *People v. Coleman*, 183 Ill. 2d 366, 379 (1998). A proceeding brought under the Act is not an appeal of a defendant's underlying judgment, but rather, a collateral attack on that judgment. *People v. Evans*, 186 Ill. 2d 83, 89 (1999). The purpose of the proceeding is to permit inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal. *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). Thus, *res judicata* bars consideration of issues that were raised and decided on direct appeal, and issues that could have been presented on direct appeal, but were not, are considered forfeited. *Id.*

¶ 106   The Act provides a three-stage process for adjudicating postconviction petitions. 725 ILCS 5/122-2.1(b) (West 2018); *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). At the first stage, the defendant files a *pro se* petition, and the circuit court has 90 days to determine, without input from the State, whether it is frivolous and patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2018). If the court does not summarily dismiss the petition, the case moves to the second stage. *Id.* § 122-2.1(b); *Hodges*, 234 Ill. 2d at 11. During the second stage of proceedings, counsel may be appointed for indigent defendants, and the State is permitted to file an answer or a motion to dismiss the petition. *Hodges*, 234 Ill. 2d at 10-11. When confronted with a motion to dismiss a postconviction petition, "the circuit court is concerned merely with determining whether the petition's allegations sufficiently demonstrate a constitutional infirmity which would necessitate relief under the Act." *Coleman*, 183 Ill. 2d at 380. At this stage, the circuit court is not to engage in any fact finding as all well-pleaded facts not rebutted by the record are taken as true. *Id.* at 380-81. The dismissal of a postconviction petition is warranted at the second stage of the proceedings when the allegations in the petition, liberally construed, fail to make a substantial showing of a constitutional violation. *Id.* at 382. If, however, the petitioner makes a substantial showing of a violation of constitutional rights, a third-stage hearing is required. *Id.* at 381. The dismissal of a postconviction petition is reviewed *de novo. Id.* at 388-89.

¶ 107   The right to assistance of counsel during postconviction proceedings is not a matter of constitutional right, but rather a matter of " 'legislative grace.' " *People v. Bell*, 2014 IL App (3d) 120637, ¶ 10 (quoting *People v. Pinkonsly*, 207 Ill. 2d 555, 567 (2003)). Thus, a defendant in postconviction proceedings is "entitled to only a 'reasonable' level of assistance, which is less than that afforded by the federal or state constitutions." *People v. Pendleton*, 223 Ill. 2d 458, 472 (2006).

41

¶ 108   To ensure that defendants are provided the reasonable assistance guaranteed by the Act, Supreme Court Rule 651(c) imposes three specific duties on postconviction counsel. Under Rule 651(c), either the record or a certificate filed by postconviction counsel must show that counsel (1) consulted with the defendant by phone, mail, electronic means or in person to ascertain the defendant's contentions of deprivation of constitutional right; (2) examined the record of the proceedings at the trial; and (3) made any amendments to the defendant's *pro se* petition, if necessary, to ensure that defendant's contentions are adequately presented. Ill. S. Ct. R. 651(c) (eff. July 1, 2017). Strict compliance with Rule 651(c) is not required, rather substantial compliance is sufficient. *People v. Richardson*, 382 Ill. App. 3d 248, 257 (2008) (citing *People v. Wright*, 149 Ill. 2d 36, 63 (1992)).

¶ 109   Under Rule 651(c), postconviction counsel's duty to amend the petition requires postconviction counsel to "shape[ ] the petitioner's claims into proper legal form." *People v. Perkins*, 229 Ill. 2d 34, 44 (2007). However, this does not mean that postconviction counsel must file an amended petition in every case. Rule 651(c) does not require counsel to amend the defendant's petition to advance frivolous or nonmeritorious claims. *People v. Greer*, 212 Ill. 2d 192, 205 (2004). Rather, counsel must make only those amendments that are necessary to adequately present the defendant's claims. *People v. Turner*, 187 Ill. 2d 406, 412 (1999). If amendments to a *pro se* postconviction petition would only advance wholly frivolous or spurious claims, the amendments are not "necessary," and would appear to violate Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018), or certain ethical obligations. See *Greer*, 212 Ill. 2d at 205-06.

¶ 110   Rule 651(c) also provides that the record shall contain a showing that postconviction counsel fulfilled these duties, which may be demonstrated by the filing of a certificate of compliance. Ill. S. Ct. R. 651(c) (eff. July 1, 2017). The filing of a Rule 651(c) certificate gives

42

rise to a rebuttable presumption that postconviction counsel provided reasonable assistance as required by the rule. *People v. Rivera*, 2016 IL App (1st) 132573, ¶ 36. A defendant has the burden to overcome the presumption by demonstrating that postconviction counsel failed to substantially comply with the duties set forth in Rule 651(c). *Id.* Whether postconviction counsel substantially complied with Rule 651(c) is reviewed *de novo. People v. Bass*, 2018 IL App (1st) 152650, ¶ 13.

¶ 111   Here, postconviction counsel filed a Rule 651(c) certificate and two supplemental certificates. In all three certificates, postconviction counsel stated that he had examined the record of the proceedings of the trial; that he had consulted personally with the defendant on two occasions; that he had corresponded, in writing, on several other occasions; and, that he had made amendments to the defendant's *pro se* petition that were necessary for the adequate presentation of the defendant's claims. Thus, there was a rebuttable presumption that postconviction counsel provided reasonable assistance as required by the rule, and the defendant had the burden to overcome the presumption by demonstrating a failure to comply with the duties mandated under Rule 651(c). *Rivera*, 2016 IL App (1st) 132573, ¶ 36. In this case, the defendant's primary claim of unreasonable assistance relates to postconviction counsel's duty to make necessary amendments to the *pro se* petition in order to adequately present a defendant's claims.

¶ 112   Here, the record demonstrates the amended petition for postconviction relief was filed on February 22, 2018, only after multiple meetings and extensive correspondence between postconviction counsel and the defendant. In the amended petition, postconviction counsel revised the allegations in the defendant's *pro se* petition, which contained pages of sprawling allegations, with numerous citations to federal case authority, in order to crystallize the

43

defendant's constitutional challenges to his sentence. I find that postconviction counsel did a notable job of synthesizing the defendant's constitutional claims into concise claims, while preserving the substance of the allegations set forth in the defendant's *pro se* petition. Although the specific phrase, "as applied," did not appear in the amended petition, the allegations in subparagraphs 8(b) and 8(c) were essentially "as-applied" challenges to the defendant's sentence under the proportionate penalties clause of the Illinois Constitution. These allegations concisely reflected, rather than omitted, those made in the defendant's *pro se* petition. Postconviction counsel also attached the journal articles referenced in the defendant's *pro se* petition, and included an affidavit from the defendant asserting that the evolving science on juvenile maturity and brain development applied in his circumstances. These allegations clearly referred to the defendant and could not have been construed as a facial challenge.[4]

¶ 113   It is important to point out that when postconviction counsel was appointed in 2017, the law in Illinois regarding the applicability of the *Miller* considerations to "young adults" was just beginning to develop, and to date, it remains unsettled. Counsel's decisions should not be judged in hindsight. Moreover, as demonstrated in the record, the defendant's substantive claims regarding violations of his constitutional rights were not lost on the postconviction court. The postconviction court denied the defendant's claim after reviewing the pleadings and arguments of the parties, the transcript of the sentencing hearing, and the decision of the appellate court, in light of the *Miller* and *Holman* decisions.

¶ 114 My colleagues have indicated that in amending the *pro se* petition, postconviction counsel omitted information that would have supported the defendant's claim that his own

---

[4]Postconviction counsel also included the defendant's facial challenge to the arbitrary age selection of 18 as the dividing line between juveniles and adults by inserting language claiming that the selection of age 18 was "arbitrary" and "not supported by science."

circumstances and mental health were so like those of a juvenile that the imposition of his sentence, absent the *Miller* considerations, violated the proportionate penalties clause. This position, however, assumes that the information was true and relevant to the sentencing proceedings. In this case, however, much of the "supportive" information alleged in the defendant's *pro se* petition was either refuted by the record or known to the postconviction court.

¶ 115   For example, the majority has referenced the defendant's claim that he had a history of psychiatric treatment since he was six years of age. This claim is rebutted by the defendant's PSI. During his PSI interview, the defendant "denied receiving any treatment for any physical or mental illness, and stated to the best of his knowledge, no close family member has received treatment for a mental illness." According to the PSI report, the defendant underwent a "45-day evaluation" by the Illinois Department of Corrections in 1991, but there is no mention of any mental health impairment that precluded the defendant from being placed on regular probation. During four encounters with the juvenile court, the defendant was continuously placed on probation, with no mention of a mental health impairment or any recommendation for counseling.

¶ 116   Moreover, the record shows that relevant factors regarding the defendant's age and upbringing were known to the sentencing court, the appellate court on direct review, and the postconviction court. It is undisputed that at the time of the offense, the defendant was 20 years old, and thus, not a juvenile. The PSI, which was admittedly read by the postconviction court, revealed an absentee father. The defendant indicated he lived with his mother, thus suggesting a relationship with her. Although the specific facts of the defendant's home life and his affiliation with a gang were not included in the PSI, it was clear that the defendant began his criminal endeavors at age 15, when he was first charged in a delinquency petition in the juvenile court.

45

Indeed, his juvenile history indicated a string of serious crimes and the use of a weapon on at least two occasions. The PSI also reported that the defendant had completed his general education diploma (G.E.D.) while incarcerated and that he had taken college courses for which he received credit. He had no record of drug abuse, although he had used marijuana in the past and occasionally drank alcohol. The PSI reported no difficulty in obtaining information from the defendant.

¶ 117   As an adult, the defendant was sentenced to the IDOC for armed robbery on August 24, 1993. While incarcerated, the defendant indicated he participated in "group therapy intervention," although he did not explain what that entailed. Then, only 49 days after his release from prison, the defendant obtained a gun and murdered Michael Hetlage. The defendant humiliated the victim by forcing him to remove his clothing, and when the victim pleaded for his life, the defendant responded by shooting him six times in the head. Based upon the evidence at trial, this murder required some aforethought, and was not a spontaneous reaction by an impetuous juvenile. Furthermore, the 20-year-old defendant was the sole actor, rather than a lookout or accomplice.

¶ 118   In addition, the evidence during trial clearly showed that the defendant knew his rights and gave a statement to the police. The trial court observed that the defendant was able to assist in his own defense at trial, and even testified in his own defense. And the trial court was able to observe the defendant speak in his allocution, wherein he claimed his innocence in the murder case, and also denied he was guilty of the armed robbery for which he had been convicted previously.

¶ 119   Simply put, the sentencing court and postconviction court had verifiable information regarding the defendant's youth and attendant characteristics. It revealed a defendant who was

46

familiar with the criminal justice system, with no evidence that the defendant had been impetuous, immature, or easily led to commit these criminal acts. As acknowledged by the majority, the postconviction court ultimately considered the defendant's constitutional challenges raised in the *pro se* postconviction petition and amended petition as "as-applied" challenges. The postconviction court reviewed the record, including the PSI, reports of proceedings, and the medical articles and determined that the sentencing court had, in fact, considered the defendant's youth and attendant characteristics. The defendant's contentions that postconviction counsel failed to provide reasonable assistance by omitting the defendant's "as-applied" challenges and his supporting facts are not supported by the record. It bears repeating that the right to counsel in postconviction proceedings is wholly statutory, and that the Act provides for a reasonable level of assistance of postconviction counsel. *Pendleton*, 223 Ill. 2d at 472. After reviewing the record, I find that postconviction counsel provided a reasonable level of assistance to the defendant, and that the defendant has failed to rebut the presumption of reasonable assistance.

¶ 120 Finally, the majority spends a great deal of time referencing *Miller* and *Holman*. It is indisputable that the defendant was 20 years of age at the time this offense was committed. Because he was an adult, the *Miller* considerations do not apply directly to his circumstances. *People v. Harris*, 2018 IL 121932, ¶ 45. In the amended petition, the defendant asserted that the evolving science on juvenile maturity and brain development applied to his circumstances, but as noted above, the evidence in the record rebuts these allegations. The record demonstrates that the postconviction court reviewed all of the relevant information surrounding the defendant's constitutional challenges. The postconviction court found that the sentencing court's consideration of the defendant's young age and his potential for rehabilitation met the standards set out in *Miller* and *Holman*. The postconviction court also found that the sentencing court

47

considered that the defendant had been convicted of a heinous crime and that the defendant's actions indicated that he was likely to remain a danger to the public. Additionally, the postconviction court noted that the defendant's claim that his sentence was excessive was raised and addressed in the defendant's appeal from his conviction. Indeed, the PSI and report of proceedings from the sentencing court provided the postconviction court with all of the information required to consider the defendant's "as-applied" challenges based upon *Miller* and *Holman*. Thus, the postconviction court properly dismissed the defendant's petition.

¶ 121   For the reasons stated herein, I specially concur.